UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| S.C. MANAGEMENT, INC., formerly d/b/a Twin Rivers Regional Medical Center, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 1:05CV12 CDP |
| MIKE LEAVITT, Secretary of the United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

Plaintiff S.C. Management (Twin Rivers) seeks judicial review of a decision

by the Secretary of Health and Human Services, denying it a new provider

exemption from routine cost limits for the skilled nursing facility it opened in 1992.

Both parties now move for summary judgment.  Because the Secretary's decision

ignored the plain language and purpose behind the new provider exemption, I will

reverse the Secretary's decision and remand this case for further proceedings

consistent with this opinion.

## Statutory and Regulatory Background

Congress enacted the Medicare program to provide federally funded health

-1-

insurance to aged and certain disabled persons.  42 U.S.C. § 1395, et seq.  Among

its many provisions, Medicare provides for the reimbursement of "reasonable costs"

of skilled nursing or rehabilitative care for Medicare beneficiaries to Medicare-

certified facilities.  42 U.S.C. § 1395f(b)(1).  This case concerns two types of

Medicare-certified facilities that administer skilled nursing and rehabilitative care:

(1) skilled nursing facilities (SNF), and (2) swing-bed hospitals.

     A SNF is a "institution (or distinct part of an institution) which is primarily

engaged in providing to residents (A) skilled nursing care and related services for

residents who require medical or nursing care, or (B) rehabilitation services for the

rehabilitation of injured, disabled, or sick persons."  42 U.S.C. § 1395i-3(a)(1).  A

SNF may be freestanding, or it may be part of a hospital.  See 42 U.S.C. §

1395yy(a) (discussing reimbursements for both hospital-based and freestanding

SNFs).

     A swing-bed hospital is a hospital that is certified by Medicare to use its

hospital beds to provide both routine inpatient hospital services as well as SNF

services.  42 U.S.C. § 1395tt(a)(1); 42 C.F.R. § 413.114.  The name derives from

the fact that the swing-bed certification permits a hospital to "swing" its hospital

beds between providing routine inpatient hospital care and furnishing skilled nursing

care.  This certification is limited to smaller hospitals (more than 49 beds, but less

than 100 beds), and is designed to grant rural hospitals the flexibility to provide SNF services where a specific geographic region may lack sufficient SNF beds.  42 U.S.C. § 1395tt(c); 42 C.F.R. § 413.114(a)(1).

Although both types of facilities have similar reimbursement schemes under Medicare, this dispute only concerns the SNF scheme.  Medicare provides that a certified SNF shall be reimbursed for the reasonable cost of providing services to Medicare beneficiaries, subject to several limitations.  42 U.S.C. §§ 1395f(b)(1), 1395x(v).  Recognizing that a pure cost-based reimbursement scheme would reward inefficient providers with larger reimbursements, Congress granted the Secretary the discretion to limit these reimbursements.  42 U.S.C. § 1395yy(c).  With this discretion, the Secretary has created routine cost limits (RCLs), which establish caps on SNF reimbursments.  42 C.F.R. § 413.30.  See also Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404-06 (1993) (discussing the routine cost limit scheme).

RCLs, however, do not apply to all SNFs.  In 42 C.F.R. 413.30(e)(1996), the Secretary created an exemption from RCLs for new providers of SNF services.  The Secretary designed the new provider exemption to "allow a [new] provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population."  Paragon Health Network v. Thompson, 251 F.3d 1141, 1149 (7th Cir. 2001); 42 C.F.R. 413.30(e).

The regulation provides:

> Exemptions from the limits imposed under this section may be granted to a new provider.  A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years.  An exemption granted under this paragraph expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.

42 C.F.R. 413.30(e)(1996).[1]

As one court explained, this language indicates that "to qualify for the new provider exemption, a facility must show that it is either (1) new, or (2) operating for the first time as a SNF or equivalent.  It follows logically that facilities that (1) have operated before under 'present or previous ownership,' and (2) have operated as a SNF or equivalent, cannot qualify as 'new providers.'" St. Elizabeth's Medical Center of Boston, Inc. v. Thompson, 396 F.3d 1228, 1231 (D.C. Cir. 2005) (emphasis in original).  This case concerns Twin Rivers' eligibility for a new provider exemption for its 1993 and 1994 cost reporting years.

## Factual and Procedural History

---

[1]The current language of this regulation is slightly different.  The regulation now reads, in relevant part, "[a] new SNF is a provider of inpatient services that has operated as a SNF (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than 3 full years."  42 C.F.R. 413.30(d)(2005) (emphasis added).

Twin Rivers is a short-term acute care hospital located in Kennett, Missouri. Twin Rivers became a Medicare-certified hospital on September 1, 1966.  In 1989, Twin Rivers entered into an agreement with the Secretary certifying the institution as a swing-bed hospital.  This certification applied to all of Twin Rivers' 97 hospital beds.  Twin Rivers operated its swing-bed program from September 28, 1989 until the hospital voluntarily terminated the program on May 1, 1991.

Fifteen months later, on August 22, 1992, Twin Rivers opened a newly constructed hospital-based SNF.  The Twin Rivers SNF became Medicare-certified three days later.  On February 23, 1994, Twin Rivers formally requested a new provider exemption under 42 C.F.R. § 413.30(e) for its new SNF for the fiscal years ending December 31, 1992, 1993, 1994, and 1995.  In accordance with Medicare's reimbursement procedure, this initial request was reviewed by a Medicare Fiscal Intermediary.  The Fiscal Intermediary recommended to the administrator of Medicare reimbursements, the Health Care Financing Administration (HCFA), that it approve Twin Rivers' request.

HCFA denied Twin River's new provider exemption request on June 15, 1994.  HCFA reasoned that "the type of skilled care rendered to a patient under a Medicare swing bed agreement is equivalent to the level of care provided in a SNF." HCFA concluded that Twin Rivers had effectively operated as a SNF or its

equivalent since it accepted its first swing-bed patient on September 28, 1989, thus

disqualifying the hospital from eligibility for the new provider exemption.

Twin Rivers timely appealed this decision to the Provider Reimbursement

Review Board (PRRB). The PRRB conducted a live hearing on November 18,

2003. The Centers for Medicare and Medicaid Services (CMS), formerly HCFA,

slightly altered its position before the PRRB and agreed with Twin Rivers that the

hospital should be entitled for a new provider exemption through the cost reporting

period ending December 31, 1992.[2] The parties still disputed whether Twin Rivers

was entitled to the new provider exemption for the cost reporting periods ending

December 31, 1993 and 1994. According to the Fiscal Intermediary's brief in

support of the Twin Rivers' appeal, the additional reimbursement Twin Rivers

sought equaled $810,705.

The PRRB upheld the Secretary's determination that Twin Rivers was not

entitled to the exemption. One member of the PRRB dissented. The PRRB

majority concluded that because the Twin Rivers swing-bed hospital provided <u>some</u>

---

[2]CMS recognized that, assuming Twin Rivers accepted its first SNF-equivalent patient on September 28, 1989, the first cost reporting period beginning at least two years after this date began on January 1, 1992 and ended on December 31, 1992. Thus, CMS conceded that Twin Rivers was entitled to an exemption through December 31, 1992. Additionally, at some point Twin Rivers dropped its claim for 1995. It's brief states that this was because the facility was not operating as a SNF in 1995.

SNF services, and those services were first provided on September 28, 1989, Twin

Rivers' new provider exemption ended on December 31, 1992.  Thus, Twin Rivers

was not entitled to an exemption for the 1993 and 1994 cost reporting periods.

The CMS Administrator declined to review the PRRB's decision, making the

PRRB decision the final agency decision.  Pursuant to 42 U.S.C. § 1395oo(f), Twin

Rivers sought judicial review of the PRRB's decision by filing this lawsuit on

January 14, 2005.

## Discussion

Jurisdiction over this action is based exclusively on 42 U.S.C. § 1395oo(f)(1),

which provides that the applicable provisions of the Administrative Procedure Act

(APA), 5 U.S.C. § 701, et seq., shall govern the dispute.  Under the APA, a court

must hold the Secretary's action unlawful and set it aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" or

"unsupported by substantial evidence ... reviewed on the record of an agency

hearing provided by statute."  5 U.S.C. § 706(2)(A), (E).

A court must defer to an agency's interpretation of its own regulations unless

an "alternative reading is compelled by the regulation's plain language or by other

indications of the Secretary's intent at the time of the regulation's promulgation."

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Gardebring

v. Jenkins, 485 U.S. 415, 430 (1988)).  If a regulation is plain on its face, a court

shall give no deference to an agency's attempt at interpretation.  St. Luke's

Methodist Hosp. v. Thompson, 315 F.3d 984, 987 (8th Cir. 2003). Additionally,

"[i]f the [agency's] interpretation of its own regulation is unreasonable, [a court] is

free to reject it."  Advanta USA, Inc. v. Chao, 350 F.3d 726, 728-31 (8th Cir.

2003).

## A. Equivalency

This dispute presents the question of whether a facility that has previously

provided limited or sporadic SNF services has operated as a SNF or the equivalent

for purposes of the new provider exemption, 42 C.F.R. 413.30(e)(1996).  The

Secretary believes that the provision of limited or sporadic services is sufficient to

qualify a facility as a SNF for purposes of the new provider exemption.  The

Secretary's rationale proceeds as follows: because the regulations clearly define a

swing-bed hospital as a provider of SNF care, and because the record demonstrates

that the Twin Rivers swing-bed facility did provide SNF care beginning on

September 28, 1989, the Twin Rivers new provider exemption expired on

December 31, 1992.

Twin Rivers maintains that the Secretary's interpretation is overly simplified,

and ignores the qualifying phrase "primarily engaged" in the statutory definition of

SNF.  Twin Rivers argues that this phrase adds a quantitative component to the regulatory concept of equivalency.  According to Twin Rivers, to operate as a SNF or its equivalent, it is not sufficient for a facility to simply provide limited SNF services.  Instead, a facility must have been primarily engaged in providing SNF services to have operated as a SNF or its equivalent.  Twin Rivers contends that the limited SNF services that its swing-bed hospital actually provided from 1989 through 1991 demonstrate that the facility was never primarily engaged as a provider of SNF care.  Thus, the new provider exemption should have applied beginning on August 25, 1992.

Notably, the parties' arguments reveal little or no disputes over the facts in this case.  Twin Rivers does not dispute that its swing-bed facility did provide SNF care beginning on September 28, 1989.  Likewise, the Secretary does not appear to contest Twin Rivers' statistics that suggest that the hospital provided a limited number of SNF swing-bed days from September 28, 1989 through May 1, 1991. The entire dispute thus rests on the parties' conflicting interpretations of what the new provider exemption regulation actually requires.

After reviewing the plain language and purpose of the new provider exemption, along with relevant court decisions, I agree with Twin Rivers that the Secretary's denial of Twin Rivers' exemption requests for the 1993 and 1994 cost

reporting periods must be overturned.

Although I am aware of no court that has directly addressed the issue before me, I find the Court's decision in St. Elizabeth's Medical Center of Boston, Inc. v. Thompson, 396 F.3d 1228, to be especially persuasive.  In St. Elizabeth's, the Court considered whether a SNF's previous certification as a nursing facility (NF) precluded its request for a new provider exemption under 42 C.F.R. 413.30(e).  The Medicaid statute defines a NF as:

> [A]n institution (or a distinct part of an institution) which is primarily engaged in providing to residents: (A) skilled nursing care and related services for residents who require medical or nursing care, (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities...

42 U.S.C. § 1396r(a) (emphasis added).  Based solely on this definition, the Secretary denied the plaintiff's new provider exemption request and held that NFs were equivalent to SNFs because they both provide the same basic range of services.  396 F.3d at 1233.

The D.C. Circuit overturned the Secretary's decision.  The Court held that a NF certification, without more, was not sufficient to qualify the NF as a SNF or its equivalent.  While a NF, by definition, certainly has the capability to provide the

same services as a SNF, this capability alone does not demonstrate that the NF was primarily engaged in providing SNF services.  After reviewing the record, the Court determined that the NF was primarily engaged in providing custodial care, and had only "occasionally provided" skilled nursing or rehabilitative care.  Thus, the Court held that the Secretary's conclusion that the NF was equivalent to a SNF was not supported by substantial evidence.  396 F.3d at 1233-34.  See also Milton Hosp. Transitional Care Unit v. Thompson, 377 F.Supp.2d 17, 25-31 (D. D.C 2005) (relying on St. Elizabeth's to hold that the a NF that provided SNF services to less than fifty percent of its patients was not operating as a SNF or its equivalent).  But see South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 105 (1st Cir. 2002) (rejecting plaintiff-provider's argument that in order to be equivalent to a SNF, a facility would have to meet the definition of a SNF).

While the Eighth Circuit has yet to address this issue, its decision in SSM Rehabilitation Institute v. Shalala, 68 F.3d 266 (8th Cir. 1995), suggests that any measure of equivalency requires a court to examine the quantity of services that were actually performed.  In SSM, the Court considered whether a hospital plaintiff previously operated as a rehabilitation hospital so as to preclude a new hospital exemption.  The Court upheld the Secretary's determination that the plaintiff had operated as a rehabilitation hospital prior to the year of its application, 1984.

-11-

Although the Court did not directly address the "primarily engaged" issue now

before me, its holding indicates that it relied on evidence of the quantity of

rehabilitation services the hospital had previously provided.  Specifically, the Court

cited the following evidence as supporting the Secretary's position:

> A 1980 advertising brochure defined SSM's mission as "provid[ing]
> comprehensive medical rehabilitation and skilled nursing rehabilitation
> to an adult and geriatric population" and boasted that SSM was "the
> one free-standing rehabilitation facility in the St. Louis area."
> Beginning not later than 1981, SSM classified its entire facility as a
> specialty rehabilitation hospital in its annual license applications to the
> State of Missouri.  The Intermediary's auditor found that in 1983 SSM
> met all of the Secretary's criteria for a rehabilitation hospital, and SSM
> was among the first hospitals in the country to be certified as a
> rehabilitation hospital in 1984.  And in late 1984, when SSM sought
> HCFA approval to relocate it facilities, it stated:
>
>> [SSM] has become identified in the region as a
>> specialized provider of comprehensive medical
>> rehabilitation services.  In order to maintain the referral
>> network that has evolved over the years, it is necessary to
>> maintain [SSM's] identity and to provide assurance to
>> those referrals that [SSM[ would continue to operate as it
>> had at its former locations.

68 F.3d at 271.  With this evidence in hand, the Court held that "the Secretary was

well within her discretion in concluding that SSM in 1984 did not face the prospect

of low occupancy rates and substantial start-up costs typically incurred by a new

hospital and therefore did not warrant a ... new hospital exemption."  Id.

    After reviewing these decisions, I will adopt the reasoning of the D.C. Circuit

from St. Elizabeth's for several reasons.  First, the St. Elizabeth's approach

comports with the plain language of the new provider exemption.  The plain

language of the exemption – operated as a SNF or the equivalent – clearly

establishes that a facility's operation must have been equal to that of a SNF.  See

Ashtabula County Medical Center v. Thompson, 352 F.3d 1090, 1097 (6th Cir.

2003) (concluding that the language of the new provider exemption has plain

meaning, notwithstanding the First Circuit's decision in South Shore).  Under the

Medicare statute, a SNF is defined not only by the type of services it provides, but

also by the intensity with which it provides those services.  In the words of the

statute, a SNF is not simply a provider of skilled nursing or rehabilitative care; it is a

provider that is "primarily engaged" in the provision of either of those two types of

care.  42 U.S.C. § 1395i-3(a)(1).  Many courts, including the Eighth Circuit, have

recognized the quantitative component of this precise phrase.  See e.g. Donovan v.

Bereuter's Inc., 704 F.2d 1034, 1038 (8th Cir. 1983) (holding that the phrase

"primarily engaged" implies that over one-half of a facility's operation must be

devoted to that particular endeavor).

        The Secretary argues that a primarily engaged test in the context of swing-bed

hospitals makes little sense because swing-bed hospitals, by definition, always

provide both skilled nursing and hospital services.  I disagree.  Contrary to the

Secretary's assertion, a swing-bed hospital does not necessarily always provide both skilled nursing care and hospital care at the same time.  Similar to the NFs discussed in St. Elizabeth's, a swing-bed hospital bed can be used either for SNF care or hospital care at one particular time.  Thus, like a NF, a swing-bed hospital has the capacity to be primarily engaged in SNF care or non-SNF care.  Under these circumstances, the D.C. Circuit held that the only way to determine if a facility actually operated as a SNF or the equivalent is to look beyond a facility's defined capabilities and examine what quantity of SNF services were actually provided.  St. Elizabeth's, 396 F.3d at 1233-34.

        Second, the Secretary's position, along with the rationale employed by the First Circuit in South Shore, implies that the Secretary is free to ignore the "primarily engaged" language if it so chooses.  While the APA affords a great deal of deference to agencies' interpretations of their own regulations, it does not grant deference to interpretations that ignore or are inconsistent with the plain language of the regulations.  See Shalala v. St. Paul-Ramsey Medical Center, 50 F.3d 522, 527-29 (8th Cir. 1995) (rejecting Secretary's interpretation of Medicare rule that was inconsistent with the rule's plain language).

        Applying St. Elizabeth's to the fact of this case, there is no question that Twin Rivers did not operate as a SNF or the equivalent during the nineteen months

it was certified as a swing-bed hospital.  It is undisputed that the Twin Rivers

swing-bed facility was not primarily engaged in providing SNF services.  Twin

Rivers' swing-bed designation applied to all of its 97 hospital beds.  However,

under Medicare regulations for hospitals of Twin Rivers' size, the total number of

SNF patient-days provided cannot exceed fifteen percent of the total available bed

days.  42 C.F.R. § 413.114(d)(2)(ii).  Thus, for an entire year, Twin Rivers' 97-bed

facility could provide approximately 5,311 (97 x 365 x 15%) SNF swing bed days.

During the three years of Twin Rivers' swing-bed operation, there were 68 swing

bed days during the 1989 fiscal year, 159 swing bed days for the 1990 fiscal year,

and 41 swing bed days for the 1991 fiscal year.  From September 28, 1989 until

May 1, 1991, Twin Rivers' facility could have provided a total of 8,439 (97 x 580 x

15%) SNF swing bed days, yet actually only provided 268 SNF swing bed days.  In

contrast, when the Twin Rivers SNF opened it provided 489 Medicare bed days in

1992, and 2283 in 1993, and 2564 in 1994.

    The evidence in this case is dramatically different from that before the PRRB

in Engelwood Community Hosp. v. Mutual of Omaha.  PRRB Dec. No. 98-D13,

1997 WL 771027 (Dec. 11, 1997).  In Engelwood, the PRRB held that the

provider's previous operation as a swing-bed facility did constitute operation as a

SNF or the equivalent for purposes of the new provider exemption.  The provider

presented an equivalency argument similar to the one presented by Twin Rivers in this case.  The PRRB rejected the provider's argument in <u>Engelwood</u> because the provider had failed to demonstrate that its swing-bed facility was not primarily engaged in providing SNF services.  The PRRB stated:

> The Board finds the Provider's assertion that the type of services rendered in the swing-beds were not equal to nor could it be compared to the scope, level, or intensity of the type of services required by a SNF provider, was not proven.  The Board finds that the Provider did not offer any evidence to demonstrate the precise differences or comparisons of these SNF-level services.

1997 WL 771027, at *9.

In this case, Twin Rivers has presented more than empty assertions to attack the Secretary's finding of equivalency.  Twin Rivers statistics clearly show that its swing-bed facility utilized its swing-bed certification at roughly three percent of its full capacity.  Under no circumstances could the Secretary construe these statistics to support a claim that the Twin Rivers swing-bed hospital was primarily engaged in providing SNF services.  Accordingly, the Secretary's finding of equivalency is not supported by substantial evidence.

Additionally, applying the rationale of <u>St. Elizabeth's</u> in this case will not frustrate the purpose of the new provider exemption.  The purpose of the exemption is to "allow a [new] provider to recoup the higher costs normally resulting from low

occupancy rates and start-up costs during the time it takes to build its patient population." Paragon, 251 F.3d at 1149.  According to the Secretary, a provider can overcome these same challenges while operating as a swing-bed hospital, and thus can use a swing-bed certification to its economic advantage by effectively prolonging the duration of a new provider exemption beyond three years.

      While this threat may exist, there is no evidence to suggest that Twin Rivers has taken advantage of this apparent loophole.  The Secretary argues that "[t]he concept behind offering swing bed services was to do so until Twin Rivers could open a freestanding nursing facility."  This statement is wholly unsupported by the record.  The Secretary relies on the PRRB hearing testimony of a Twin Rivers nurse.  While discussing Twin Rivers' swing-bed operation, the nurse was asked, "And the concept was they were in there until a freestanding nursing facility bed opened, is that what the concept was?"  The nurse replied, "Yes, that's correct." This question referred to Twin Rivers' statutory obligation as a swing-bed provider to transfer all swing-bed patients to a different area SNF within five days of a SNF bed opening at a neighboring facility.[3]

      The record also fails to demonstrate that Twin Rivers' swing-bed operation

_____

      [3]42 C.F.R. § 413.114(d)(1)(I) provides, "[i]f there is an available SNF bed in the geographic region, a [swing-bed] patient must be transferred within 5 days ... of the availability date."

realized any of the benefits that the new provider exemption was designed to provide to new SNFs.  It is undisputed that Twin Rivers provided limited and sporadic SNF services through its swing-bed operation.  Additionally, there was a fifteen month gap between when the swing-bed operation was terminated and the SNF opened.  There is no evidence to suggest that Twin Rivers' SNF maintained any of its swing-bed clients, or decreased its SNF start-up costs on account of its earlier operation as a swing-bed hospital.

In sum, the Secretary has failed to produce any evidence that would suggest that the Twin Rivers' SNF did not face the low occupancy rates and substantial start-up costs normally associated with the opening of a new SNF.  Cf. SSM, 68 F.3d at 271 (describing the substantial evidence that supported the Secretary's conclusion that a new provider had previously established its patient population prior to opening its new facility).  The evidence, when viewed as a whole, demonstrates that Twin Rivers gained little, if any, advantage over similarly situated SNFs by previously operating a swing-bed hospital.  For these reasons, the Secretary's denial of the new provider exemption for Twin Rivers' 1993 and 1994 cost reporting periods must be overturned.  Accordingly, I will grant summary judgment in favor of Twin Rivers.

## B.  Remedy

As a general matter, remand is the most common remedy in this type of case. As the Supreme Court explained, "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).

Twin Rivers argues that a remand is unnecessary this case because there is nothing left for the Secretary to do. I disagree. As was evident from the parties' oral arguments, it is unclear whether the Secretary ever reviewed Twin Rivers' requested reimbursements for the 1993 and 1994 cost reporting periods. Under the statute, even if new provider exemption applies, the Secretary retains the authority to determine the precise reimbursement that a provider may receive. See 42 U.S.C. §§ 1395yy, 1395x(v), 1395f(b). There is no indication from the record or the parties' arguments that the Secretary has conducted a review and made such a determination. Accordingly, I will remand this case to the Secretary to determine the amount that Twin Rivers' is entitled to for its 1993 and 1994 cost reporting periods under the new provider exemption.

For the foregoing reasons,

-19-

**IT IS HEREBY ORDERED** that plaintiff S.C. Management, Inc.'s motion for summary judgment [# 20] is granted in part and denied in part.

**IT IS FURTHER ORDERED** that defendant Mike Leavitt's motion for summary judgment [# 23] is denied.

A separate judgment is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2005.

-20-